UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

RASHON D. HUDGINS,                    )
                                      )
                    Petitioner,       )          Case No. 1:03-cv-783
                                      )
v.                                    )          Honorable Gordon J. Quist
                                      )
KURT JONES,                           )
                                      )          **REPORT AND RECOMMENDATION**
                    Respondent.       )
_____)

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.
§ 2254.  Petitioner is serving a term of eight years and four months to fifteen years, imposed by the
Genesee County Circuit Court on November 13, 2000, after a jury convicted Petitioner of unarmed
robbery, MICH. COMP. LAWS § 750.530.  In his *pro se* petition, Petitioner raises four grounds for
relief, as follows:

I.      THE EVIDENCE [WAS] INSUFFICIENT TO SUPPORT THE UNARMED
        ROBBERY CONVICTION.

II.     THE TRIAL COURT REVERSIBLY ERRED IN OVERRULING THE
        DEFENSE OBJECTION TO THE ADMISSION OF CRIME-SCENE
        PHOTOGRAPHS.

III.    THE TRIAL COURT VIOLATED THE U.S. AND MICHIGAN
        CONSTITUTIONS IN SENTENCING THE DEFENDANT TO A PRISON
        TERM OF 100 MONTHS (8 YEARS, 4 MONTHS) TO 180 MONTHS (15
        YEARS) ON THE HABITUAL OFFENDER 2d SUPPLEMENT ARISING
        OUT OF THE UNARMED ROBBERY CONVICTION.

IV.     THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO GIVE AT
        SENTENCING THE ADVICE-OF-RIGHTS REQUIRED BY MCL
        769.34(7); MSA 28.1097(34)(7).

V.    [PETITIONER'S] CONVICTION FOR UNARMED ROBBERY [MUST] BE REVERSED AS VIOLATIVE OF HIS STATE AND FEDERAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, WHERE HIS TRIAL COUNSEL MADE SERIOUS ERRORS THAT PREJUDICED HIS DEFENSE.
A. FAILURE TO MOTION [SIC] FOR DIRECTED VERDICT;
B. FAILURE TO MOTION [SIC] FOR SEVERANCE; [AND]
C. FAILING TO REQUEST LIMITING INSTRUCTION.

Respondent has filed an answer to the petition (docket #16) stating that the grounds should be denied. Upon review and applying the AEDPA standards, I find that Petitioner's claims are without merit. Accordingly, I recommend that the petition be denied.

**Procedural History**

### A. Trial Court Proceedings

The state prosecution arose from the armed robbery of Khirfan's Trading Post, a neighborhood grocery store at 3507 North Franklin in Flint. Petitioner and co-defendant Christopher Wright were charged in connection with the incident. Wright was accused of actually committing the robbery, while Petitioner was charged with armed robbery under an aiding and abetting theory for providing transportation to and from the robbery. Petitioner and Wright were tried together on October 11-13, 2000.

Mhommad Khirfan, the owner of Khirfan's Trading Post, testified that he worked at the store on the night of Friday, August 11, 2000. (Tr I, 105.) Randy Hudnall was also working that night. (Tr I, 106.) Khirfan testified that Petitioner and Wright came into the store together, purchased a six-pack of beer, and left. (Tr I, 107-109.) Khirfan was unequivocal in his identification of Petitioner and Wright (Tr I, 127.) A few minutes later, Wright returned to the store and robbed Khirfan. (Tr I, 107-108.) Khirfan was behind the counter waiting on a customer when Wright came

- 2 -

back into the store.  (Tr I, 110.)  Wright stepped behind the counter, pushing Khirfan out of the way.  (Tr I, 111.)  Wright then pulled out a black .38 revolver, pointed the gun at Khirfan's chest and demanded money.  (Tr I, 111-12.)  Khirfan told Wright to take the money from the cash register.  (Tr I, 112.)  Wright emptied the register and took a box of rolled change kept under the register.  (Tr I, 112, 114.)  After that, Wright took the money from a second cash register where they kept the money for the lottery machine.  (Tr I, 112.)  Wright continued to demand more money, so Khirfan gave him another cash register drawer that had been prepared for the second shift.  (Tr I, 113.)  When Khirfan refused Wright's orders to lie down on the floor, Wright struck him with the gun on the side of the head.  (Tr I, 113.)  Khirfan complied by lying down on the floor and Wright left the store.  (Tr I, 117.)  Khirfan tripped the alarm and went outside to see what direction the assailants were going.  (Tr I, 117.)  He saw Petitioner driving a white Cadillac out of the parking lot with the headlights turned off.  (Tr I, 118-20.)

Randy Hudnall testified that he was in the back of the store working on bottles when he heard Khirfan yell like he had been hit.  (Tr I, 168, 176.)  As Hudnall walked toward the front counter, he saw Khirfan down on the floor with a man standing over him holding a pistol.  (Tr I, 169.)  Hudnall identified Wright as the man with the gun.  (Tr I, 171.)  Hudnall backed-up a couple of steps and waited for the man to leave.  (Tr I, 169.)  Hudnall saw the man take the cash register drawer and leave the store.  (Tr I, 169.)  Hudnall hit the alarm button and called 911.  (Tr I, 170.)

Joseph Bradley testified that he went into Khirfan's Trading Post around midnight to buy some beer.  (Tr I, 187.)  On his way from the beer cooler to the front counter, Bradley saw a man behind the counter pointing a gun at Mr. Khirfan's head.  (Tr I, 187-88.)  Bradley did not think the man had seen him, so he ducked out of sight.  (Tr I, 189.)  Bradley could hear the man telling Mr.

Khirfan to give him the money.  (Tr I, 189.)  When the man left the store, Bradley could see that he

was carrying something in front of him.  (Tr I, 191.)  Bradley followed the man out of the store and

saw him get into the passenger seat of a white Cadillac.  (Tr I, 195, 199.)  Bradley had seen the

Cadillac in the parking lot when he arrived.  (Tr I, 198.)  The Cadillac pulled out of the parking lot

with its headlights turned off.  (Tr I, 195.)  Bradley asked Steve Hardy, one of his friends that was

out in the parking lot, to follow the Cadillac and get the license plate number.  (Tr I, 191.)  Hardy

came back a few minutes later with the plate number.  (Tr I, 195.)

       David Beck testified that he and his wife, Becky, went to the Khirfan Trading Post

at about midnight.  (Tr I, 208.)  They pulled into the parking lot at the same time as their friends,

Steven Hardy and Joe Bradley.  (Tr I, 208.)  David Beck went into the store while Rebecca remained

in the parking lot.  As David walked through the store, he saw Bradley down on the floor and

realized that something was wrong.  (Tr I, 209.)  David looked up toward the front of the store and

saw a black man holding a gun to the owner's head.  (Tr I, 209.)  David could hear the gunman

demanding (that the owner give him) money from the registers.  (Tr I, 210.)  David stayed in the

back of the store and ducked behind some boxes.  (Tr I, 209.)  David also followed the gunman out

the door and saw a white Cadillac pulling out of the parking lot with the lights turned off.  (Tr I,

211.)  David saw the Cadillac in the parking lot when they arrived at the store.  (Tr I, 215.)

       Rebecca Beck testified that she was sitting in the car talking to Steve Hardy when

David went into the store.  (Tr I, 226-27.)  After David went in, Becky saw a black man come out

of the store and get into the white Cadillac parked on the side of the building.  (Tr I, 227.)  The man

pulled the car  up to the front of the driveway in such a manner that he was blocking the Becks'

truck.  (Tr I, 227-28, 234.)  After he moved the car, he got out and opened the passenger-side door

and left it open.  (Tr I, 227-29.)  The man starting walking toward the store, but then turned and went back to the car.  (Tr I, 229.)  A few minutes later, another black man came out of the store and got into the open passenger door of the car.  (Tr I, 227, 230, 234.)  The man who came out of the store was carrying something in front of him.  (Tr I, 252.)  The car pulled out of the parking lot with the lights turned off.  (Tr I, 227.)

Steven Hardy was standing in the parking lot talking to friends when  the robbery occurred.  Hardy testified that he saw the white Cadillac move while he was in the parking lot.  (Tr I, 271.)  Joe Bradley came out and reported the robbery.  (Tr I, 270.)  Just before Bradley came out, Hardy saw a man come out of the store and get into the passenger-side of the Cadillac.  (Tr I, 272.)  Hardy jumped in his car and followed the Cadillac out of the parking lot.  ( Tr I, 272.)  Hardy wrote the license plate number down on his hand.  (Tr I, 270.)  After he got the license plate number, Hardy pulled up along the passenger-side of the car.  (Tr I, 270.)  Hardy saw two men in the front seat of the car.  (Tr I, 275.)  The man in the passenger seat pulled his hand up.  (Tr I, 270, 275.)  Based upon his hairstyle, Hardy identified the man in the passenger seat as Christopher Wright.  (Tr I, 276-78.)  Hardy ended his pursuit and went back to the Khirfan Trading Post and gave the license plate number to the police.  (Tr I, 279.).

Officer Matthew Lasky of the Mt. Morris Township Police Department testified that he and his partner, Officer Hite, heard a report about the Khirfan Trading Post robbery over the police radio along with a description of the white Cadillac and license plate number.  (Tr I, 298-99.)  At 12:26 a.m., the officers saw a car matching the description and plate number parked in the driveway of a residence at 5259 Summit Street.  (Tr I, 300.)  One man was sitting in the passenger seat of the car and another was at the front door of the residence.  (Tr I, 300.)  The officers drove by

and circled around the block.  Officer Lasky got out of the car on the street one block behind Summit and approached on foot, while Officer Hite drove back around to Summit to approach the two subjects.  (Tr I, 300-301.)  While Lasky was waiting behind the residence, he heard Hite yelling "stop."  (Tr I, 301.)  At that point, Lasky saw two black men running directly toward him.  (Tr I, 301.)  Lasky made his presence known and ordered the subjects to stop.  (Tr I, 302.)  The man later identified as Petitioner, continued to run toward Lasky, while the other man changed his direction.  (Tr I, 302.)  Lasky and Petitioner collided and fell to the ground.  (Tr I, 304-336.)  After a short struggle, Lasky handcuffed Petitioner and took him into custody.  (Tr I, 304.)  Petitioner continued to struggle and resist as Lasky placed him in the patrol car.  (Tr I, 305.)  While he was being arrested, Petitioner volunteered statements that he was the victim in the incident; that he was forced to be involved in the robbery and held at gunpoint.  (Tr I, 306-307, 345.)

After Petitioner was secured in the patrol car, Officer Lasky returned to the area in the back yard where he struggled on the ground with Petitioner.  (Tr I, 307.)  Lasky found five rolls of dimes, a baggie containing loose dimes, and a set of keys lying on the ground.  (Tr I, 308.)  Lasky turned over the items to the City of Flint Officers who had arrived at the scene.  (Tr I, 308.)  When Lasky and Sergeant Blake searched Petitioner, they found $255 cash and a novelty three- dollar bill in his front left pocket.  (Tr I, 309.)  In his other pocket they found (4) fifty-cent pieces and (1) one-dollar coin.  (Tr I, 309.)  The second man was taken into custody about a block away on Cornell Street.  (Tr I, 303.)  A LEIN inquiry revealed that the white Cadillac was registered to Petitioner.  (Tr I, 352.)

Officer Hite testified that after he circled the block he returned to the front of the residence where the two suspects were parked.  (Tr II, 361.)  When the suspects saw him

approaching, they fled on foot.  (Tr II, 361-62.)  Hite took chase on foot after one of the suspects.

Hite lost the suspect in the yard of 1180 South Cornell.  (Tr II, 363.)  While the suspect was running,

Hite saw him pull a handgun out of his waistband with his right hand.  (Tr II, 363.)  Two other

officers arrived and they continued to search the area around the house.  (Tr II, 364.)  A young man

came out of the residence at 1180 South Cornell and informed the officers that a man had just run

into his house.  (Tr II, 364.)  Officers went into the house and took the suspect into custody.  Hite

identified the suspect as Christopher Wright.  (Tr II, 366.)  Wright was unarmed at the time of his

arrest, so the officers continued to search the area for a gun.  (Tr II, 367.)  They found $718 in cash

and some lottery receipts lying on the ground by the back door of 1180 South Cornell.  (Tr II, 367-

68.)  The officers never found a gun.  (Tr II, 368.)

   Thirteen-year-old Jeremiah Huntley testified that he was at home with his step-brother

during the early morning hours of August 12, when he heard a knock at the back door.  (Tr I, 260-

61.)  When Huntley opened the door, a strange man pushed him out of the way and ran upstairs.

(Tr I, 262.)  Huntley went outside and alerted the police officers that were in the back yard.  (Tr I,

263.)  Huntley stayed outside until the officers brought the man out of the house.  (Tr I, 263.)

   Sergeant Scott Sutter of the Flint Police Department determined from his

investigation that Petitioner lived at 5259 Summit at the time of the robbery.  (Tr II, 465.)  Sutter also

testified that Wright had a previous felony conviction.  (Tr II, 464.)

   Petitioner testified that he owned a white, 1985 Cadillac sedan.  On Friday August 11,

2000, Petitioner sold a similar white Cadillac to a friend, Freddie Booth, for $200 cash.  (Tr II, 487-

88.)  Late on the afternoon of August 11, Petitioner and Christopher Wright went to a friend's house

where they played craps.  (Tr II, 491.)  Petitioner had known Wright for a few years.  (Tr II, 545.)

Petitioner and Wright left the house at 11:00 p.m. (Tr II, 492.)  They stopped at the Khirfan Trading

post to buy more beer.  (Tr II, 493-94.)  Petitioner testified that he went into the store alone and purchased a six-pack of beer.  (Tr II, 497-98.)  As Petitioner was paying for his beer, he saw Wright walk into the store.  (Tr II, 498.)  While Petitioner was waiting in the car for Wright, he was trying to listen to the radio.  (Tr II, 498.)  He pulled his car up toward the front of the parking lot because he was having trouble with radio reception.  (Tr II, 498-501.)  Petitioner testified that Wright walked out of the store in a normal manner and got into the passenger side of the car.  (Tr II, 503.)  Petitioner denied that he opened the door for Wright or that Wright was carrying something in his hands. (Tr II, 503, 556-57.)  Petitioner further claimed that he  turned-on his headlights in the parking lot, but they did not come on right away due to an automatic delay feature.  (Tr II, 505.)

        Petitioner testified that when he and Wright arrived at his home on Summit Street he pulled the car into the driveway.  (Tr II, 506.)  Petitioner saw the police cruiser drive by slowly while he was standing in front of his house, but did not pay much attention.  A few minutes later, Petitioner heard someone yell "freeze" and "get down."  (Tr II, 509.)  Petitioner claimed that he complied with the officer's order and lay down flat on the ground.  (Tr II, 510.)  Petitioner denied that he ran or that he collided with the police officer.  (Tr II, 510.)  The officer put him in handcuffs and placed him in a police car.  (Tr II, 512.)  Petitioner asked the officer what was going on, but denied making any other statements to the officer to the effect that he was forced to participate in the robbery.  (Tr II, 512, 557.)  According to Petitioner, the money found in his front right pocket was from the sale of his car and winnings from gambling earlier that night.  (Tr II, 515.)  Petitioner denied having any knowledge of the robbery or assisting in the robbery.  (Tr II, 552.)  He initially denied taking any money from Wright that night, but later testified that Wright gave him $5.00 in repayment from the craps game.  (Tr II, 555, 561.)  Petitioner testified that he had pleaded guilty to breaking and entering a building with intent to commit larceny in 1999.  (Tr II, 519, 542.)

Freddie Lee Booth, Sr., testified that Petitioner sold him a white, 1986 Cadillac Sedan DeVille for $200.00 on the afternoon of August 12, 2000. (Tr II, 474.)  Booth paid Petitioner in cash. (Tr II, 475-76.)  Petitioner owned another almost identical Cadillac.  (Tr II, 477-78.)

With regard to Petitioner, the trial court instructed the jury on the charge of armed robbery, as well as the lesser offense of unarmed robbery.  (Tr II, 661-65.)  At the conclusion of trial on October 13, 2000, the jury found Petitioner guilty of the lesser charge of unarmed robbery. (Tr III, 683.)   On November 13, 2000, Petitioner was sentenced as an habitual offender to imprisonment for 100 to 180 months.  (Sentencing Transcript, ("S. Tr."), 10, docket #26.)

**B.  Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on May 22, 2001, raised four claims that correspond with Petitioner's first four grounds for habeas corpus relief.  (See Def.-Appellant's Br. on Appeal, docket #27.)  Petitioner filed a *pro per* supplemental brief in which he raised a claim of ineffective assistance of trial counsel, which is now presented as his fifth claim for habeas corpus relief.  (See Def.-Appellant's Supp. Br. on Appeal, docket #27.)  By unpublished opinion issued on November 22, 2002 the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (See 11/22/02 Mich. Ct. App. Opinion ("MCOA Op."), docket #27.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same five claims raised before and rejected by the Michigan Court of Appeals.  By order entered July 11, 2003, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See Mich. Ord., docket #27.)

- 9 -

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB.
L. 104-132, 110 STAT. 1214 ("AEDPA").  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The
AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect
to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has
"drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.
2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant
to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits
in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved
an unreasonable application of, clearly established federal law as determined by the Supreme Court
of the United States; or (2) resulted in a decision that was based upon an unreasonable determination
of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme
Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and
not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d
at 655.  This Court also may not consider decisions of lower federal courts in determining whether
the state decision is contrary to, or an unreasonable application of, clearly established federal law.
*Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is
"limited to an examination of the legal landscape as it would have appeared to the Michigan state
courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."
*Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that
contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 540 U.S. 1004 (2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

I.        <u>Sufficiency of the Evidence: Ground I</u>

Petitioner first claims that the prosecutor failed to present sufficient evidence to sustain his conviction for unarmed robbery. Petitioner does not dispute that he and Wright were at the Khirfan Trading Post or that Wright committed the robbery. Rather, he argues that there was insufficient evidence that he had any knowledge of the robbery at the time it was committed or that he intended to assist Wright in the robbery.

A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-402 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The Michigan Court of Appeals concluded that the prosecutor presented sufficient evidence to sustain Petitioner's conviction on an aiding and abetting theory, stating:

> Hudgins was charged with armed robbery, but the jury was instructed on the lesser offense of unarmed robbery. The jury was further instructed that, pursuant to MCL 767.39, "[e]very person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or

- 12 -

abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense."

Viewed in a light most favorable to the prosecution, the evidence was sufficient to enable the jury to find that Hudgins aided Wright in the commission of a robbery by providing transportation to the place of the robbery and driving Wright away from the scene. Indeed, a witness testified that Hudgins opened the passenger door of the getaway car, apparently so that Wright could enter the car quickly after leaving the scene of the robbery. Testimony was also introduced that Hudgins drove the car away from the scene without lights, even though the robbery occurred after dark. Moreover, Hudgins attempted to flee from police and allegedly made a statement about a robbery to the police, and rolls of dimes were found in the location where Hudgins was arrested. Sufficient evidence supported Hudgins' conviction.

(MCOA Op. at 5.) I agree that the prosecutor presented sufficient evidence that Petitioner aided and

abetted Wright in the robbery by providing transportation to and from the robbery.  The victim,

Mhommad Khirfan, testified that Petitioner and Wright first came into the Khirfan Trading Post

together and bought a six-pack of beer. (Tr I, 107-109.) A few minutes later, Wright came back into

the store and robbed Khirfan at gunpoint.  (Tr I, 107-117.)  One employee and two customers who

were inside the store witnessed the robbery. (Tr I, 168-170; 187-189; 208-209.)  While Wright was

inside the store, two witnesses observed Petitioner waiting in the parking lot in his car.  The

witnesses testified that while Petitioner was waiting he pulled his car up closer to the street and open

the passenger side door, leaving it ajar.  (Tr I, 227-234; 271.)  Witnesses further testified that Wright

left the store carrying a cash register drawer and got into the passenger side of Petitioner's car. (Tr I,

169; 191, 195-98; 252.)  Petitioner then pulled out of the parking lot and drove away in the dark with

his lights turned off.  (Tr I, 118-20; 195; 211; 227; 272.)

Officer Lasky  presented testimony that when he came into contact with Petitioner

about half an hour after the robbery, Petitioner attempted to flee.  (Tr I, 300-305.)  Petitioner

struggled with Lasky on the ground and continued to resist as the officer handcuffed him and placed

him in the patrol car. (Tr I, 304-305.)  Officer Lasky testified that as he was arresting Petitioner, he

- 13 -

made spontaneous statements about a robbery.  (Tr I, 306-307, 345.)  Lasky further testified that

Petitioner was found to be in possession of $255 in currency and some coins.  (Tr I, 309.)  In

addition, Officer Lasky found five  rolls of dimes, a baggie containing loose dimes, and keys to

Petitioner's car laying on the ground where he had collided with and struggled with Petitioner. (Tr I,

308.)  According to Mr. Khirfan, Wright stole approximately $1200 in currency and a box of rolled

change.  (Tr I, 112, 115-16.)  A jury could reasonably infer from the evidence presented at trial that

Petitioner knowingly intended to assist Wright in the robbery.  Consequently, the decision of the

Michigan Court of Appeals was not an unreasonable application of *Jackson*.

## II.   Admission of Crime Scene Photographs: Ground II

Petitioner claims that the trial court committed reversible error when it admitted

photographs of the crime scene over the objection of defense counsel.  (Tr I, 124.)  The five

photographs at issue depicted the outside and inside of the Khirfan Trading Post.  (Tr I, 122-23.)

Counsel objected to the photographs because the prosecutor's office failed to produce the

photographs in response to Petitioner's discovery request.  (Tr I, 124.)

The extraordinary remedy of habeas corpus lies only for a violation of the

Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S.

62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state

law "is no part of the federal court's habeas review of a state conviction [for] it is not the province

of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-

68.   Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court

evidentiary rulings cannot rise to the level of due process violations unless they offend some

principle of justice so rooted in the traditions and conscience of our people as to be ranked as

fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir.), *cert. denied*, 540 U.S. 930 (2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552.

The photographs in question were merely images of the store where the robbery took place.  The Michigan Court of Appeals held that the admission of the photographs was harmless because they could not possibly have affected the jury's verdict in light of the additional evidence properly introduced at trial.  (MCOA Op. at 6.)  I agree without reservation that Petitioner was not denied a fundamentally fair trial due to the admission of the photographs.

III.     Sentencing: Grounds III-IV

Petitioner contends that his sentence of 100 months to 180 months violated his state and federal rights against cruel and unusual punishment.  To the extent Petitioner asserts a violation of the Michigan Constitution, the argument does not give rise to a cognizable claim for federal habeas corpus relief.  28 U.S.C. § 2254(a); *Austin v. Jackson*, 213 F.3d 298, 300-02 (6th Cir. 2000); *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988).  Furthermore, Petitioner's sentence does not constitute cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.  The United States Constitution does not require strict proportionality between a crime and its punishment.  *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991); *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment."  *Marks*, 209 F.3d at 583.  A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'"  *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir.2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)).  Furthermore, "Federal courts will not engage in a

proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole." *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995). Petitioner was not sentenced to death or life in prison without the possibility of parole. Therefore, Petitioner's sentence of 100 to 180 months does not run afoul of the Eighth Amendment.

Petitioner also claims that the trial court erred by failing to give him the advice-of-rights required by MICH. COMP. LAWS § 769.34(7), which provides that if the trial court imposes a minimum sentence that is longer than the sentencing guideline range, the court must advise the defendant of his right to appeal. As set forth above, alleged violations of state law are not cognizable in federal habeas corpus proceedings. 28 U.S.C. § 2254(a); *Austin*, 213 F.3d at 300-02; *Cooper*, 837 F.2d at 286. Moreover, as noted by the Michigan Court Appeals, Petitioner's minimum sentence was within the guideline range; therefore, he was not entitled to the advice of rights required by state statute.[1]

IV.     Ineffective Assistance of Counsel: Ground V

Petitioner asserts three claims of ineffective assistance of trial counsel. First, he claims that counsel was ineffective when he failed to move for a directed verdict of acquittal after the prosecutor closed his proofs. Petitioner maintains that the evidence was clearly insufficient to support the charge of aiding and abetting armed robbery. Second, Petitioner maintains that counsel was ineffective for failing to move to sever his trial from that of his co-defendant. Petitioner maintains that he was prejudiced by evidence that Wright assaulted the robbery victim, fled from police and invaded a home while being pursued by police. Finally, Petitioner asserts that counsel was ineffective when he failed to request a limiting instruction regarding evidence of flight.

---

[1]In his supporting brief, Petitioner indicates that the guideline range for his minimum sentence was 50 to 125 months. (Petitioner's Memorandum of Law in Support of Petitioner for Writ of Habeas Corpus, 26, docket #1.) Accordingly, Petitioner's minimum sentence of 100 months was within the guideline range.

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 687.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1).  *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1164 (2004).

The Michigan Court of Appeals rejected Petitioner's claim of ineffective assistance of counsel, stating:

> Finally, Hudgins argues that his conviction must be reversed because he received the ineffective assistance of counsel. Hudgins identifies three errors allegedly committed by trial counsel. First, Hudgins maintains that his trial attorney erred by failing to move for a directed verdict. However, there was sufficient evidence to support Hudgins' conviction of either armed or unarmed robbery. Hence,

trial counsel was not ineffective by failing to move for a directed verdict. Counsel is not required to put forth a meritless position. *Snider, supra* at 425.

Hudgins also contends that trial counsel should have moved to sever his trial from Wright's. However, the court did not abuse its discretion by joining the trials of Wright and Hudgins for the reasons discussed above. Moreover, even if the two defendants had separate trials, much of the evidence of which Hudgins now complains, including the store owner's testimony about the details of the robbery and the police officers' testimony about the defendants' flight, would have been admissible at defendant Hudgins' separate trial. Hudgins' attorney was not ineffective for failing to request a severance.

Hudgins lastly argues that counsel should have requested a limiting instruction with regard to the evidence of flight. However, the trial court gave the standard cautionary instruction with regard to the flight evidence. We cannot conclude that a further instruction would have affected the outcome of the case, and thus no ineffective assistance of counsel occurred. *Effinger, supra* at 69.

(MCOA Op. at 7.)  The decision of the Michigan Court of Appeals is right on point.  As discussed above, the prosecutor presented sufficient evidence to support Petitioner's conviction for unarmed robbery.  Counsel's failure to make a frivolous or meritless motion for directed verdict does not constitute ineffective assistance of counsel.  *See Chegwidden v. Kapture*, No. 03-1527, 2004 WL 551471, at *2 (6th Cir. March 18, 2004), *cert. denied*, 125 S. Ct. 172 (2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978).

Petitioner also claims that counsel was ineffective for failing to move to sever Petitioner's trial from that of his co-defendant.  Petitioner maintains that he was prejudiced by evidence that Wright assaulted the robbery victim, fled from police and invaded a home while being pursued by police.  A criminal defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial.  *See Zafiro v. United States*, 506 U.S. 534, 540 (1993).  Indeed, he does not have a right to a separate trial where defendants present antagonistic

- 18 -

defenses, which did not even occur in this case.  *See United States v. Day*, 789 F.2d 1217, 1224 (6th Cir. 1986) (holding that absent some indication that the alleged antagonistic defendants misled or confused the jury, the mere fact that co-defendants blame each other does not compel severance). Courts should grant a severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro*, 506 U.S. at 539.

Trial counsel had no legitimate grounds for seeking a severance in this case.  Co-defendant Christopher Wright did not present a defense that was antagonistic in any way to Petitioner's defense.  Petitioner cannot show that a joint trial compromised a specific trial right or prevent the jury from making a reliable judgment about his guilt or innocence.  As stated by the Michigan Court of Appeals, details of the robbery, as well as the flight and apprehension of Petitioner and Wright, would undoubtedly have been presented at Petitioner's separate trial.  Once again, counsel cannot be found ineffective for failing to make a frivolous or meritless motion.  *See Chegwidden*, 2004 WL 551471, at *2; *Butler*, 360 F.3d at 795; *James*, 24 F.3d at 27; *Koch*, 907 F.2d at 527; *Wright*, 573 F.2d at 684.

Finally, Petitioner asserts that counsel was ineffective for failing to request a cautionary instruction in evidence of flight.  However, as pointed out by the Michigan Court of Appeals, the trial court gave a standard instruction on evidence of flight.  The court stated:

> Now, members of the jury, there has been some evidence introduced in this case that the defendants fled from the scene of this crime.  This evidence does not prove guilt. A person may run or hide or flee for innocent reasons, such as panic, mistake or fear. A person may also run or hide or flee because of a consciousness of guilt.  You must decide whether the evidence is true and if true whether it shows that the defendant had a guilty state of mind.

(Tr II, 658.)  Petitioner appears to be under the misapprehension that no cautionary instruction was given on evidence of flight.  Because the standard cautionary instruction was given, Petitioner's claim of ineffective assistance of counsel is clearly without merit.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:     April 25, 2005          /s/  Hugh W. Brenneman, Jr.
                                   Hugh W. Brenneman, Jr.
                                   U.S. Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).